**MAX JORDAN BAUUNTERNEHMUNG**

v.

**The UNITED STATES.**

No. 642–83C.

United States Claims Court.

Aug. 27, 1986.

Reed L. von Maur, Frankfurt/Main, Federal Republic of Germany, for plaintiff; O'Haire, Fiore & von Maur, James K. Stewart, Schwalb, Donnenfeld, Bray & Silbert, of counsel.

Terrence S. Hartman, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, for defendant.

## OPINION

HARKINS, Judge:

Max Jordan Bauunternehmung (Jordan) is a construction enterprise in the Federal Republic of Germany (FRG) that, operating as a general contractor, obtained a firm fixed price contract on February 8, 1971, to construct two additional jet fuel underground storage tanks at the Rhein/Main Air Base, near Frankfurt/Am Main, FRG. The construction work was completed and accepted, and the only dispute is whether Jordan is entitled to additional compensation on a constructive change claim and a delay claim as a result of the contracting officer's directive to select from an approved list a subcontractor for interior coating work on the tanks. These claims were considered by the United States Army, Europe (USAREUR) Board of Contract Appeals [1] and, on stipulation of the parties, were considered de novo on the USAREUR BCA record by the Armed Services Board of Contract Appeals (ASBCA).[2] Plaintiff in this court challenges, under the standards of the Wunderlich Act, the ·ASBCA decision to deny any equitable adjustment under the contract.[3]

---

1. USAREUR BCA No. 400, dated Jan. 25, 1978.

2. ASBCA No. 23055, Feb. 22, 1982, 82–1 BCA ¶ 15685.

3. 41 U.S.C. §§ 321–22 (1982).

The ASBCA decision, which occupies 42 pages in the 82–1 BCA reporter, includes a detailed enumeration of facts and a comprehensive analysis of applicable law. Although Jordan alleges that the board's conclusory determinations are erroneous, it does not separately identify any specific fact finding that it contends should not be accorded finality. The board's findings of fact are accepted. A recital of the board's findings of fact, however, is unnecessary, and the following statement of the facts is given to provide a perspective on Jordan's claims.

The solicitation for the contract for additional jet fuel storage facilities was issued September 23, 1970. Prior to its issuance USAFE had investigated possible sources of serious contamination problems that had been experienced in jet fuel, and had concluded that part of the solution for protection was to coat the interiors of fuel storage tanks. Further investigation by the USAFE Fuel Facilities Engineer resulted in a "full span" quality control system, which had the objective of protecting jet fuel from contaminates from the time of manufacture to the time of its use in aircraft. One step in this system was to coat the interiors of tanks to protect the fuel against the rust which formed as a result of corrosion. By 1968, criteria had been developed that established specifications for material and for application techniques. By 1970, the list of firms qualified for coating the interior of jet fuel tanks included four firms. The USAFE, NATO and the German Ministry of Defense (MOD) each adopted the same criteria, each maintained a list of qualified firms, there were only four firms on each list, and they were the same four firms. The existence of these lists was well known in the tank coating industry in Germany prior to the time of the Jordan contract. The lists included three German and one Belgian firm.

The solicitation and the contract established high standards for selection of firms to perform the epoxy coating work on the insides of the jet fuel tanks, and provided detailed specifications to control performance of that work. Proposed contractors were required to submit evidence satisfactory to the contracting officer that their company had the necessary equipment on hand and sufficient experience in cleaning and coating jet fuel storage tanks of the type and size involved (8,000 cubic meters, approximately 50,000 barrels). Such evidence was to include: (1) list of all equipment to be used; (2) address of manufacturer of the equipment; (3) agency granting safety approval; (4) a list of past contracts completed, showing size and type of tanks cleaned and coated; (5) type of coating; (6) products in tanks; (7) and name and address of organization for which performed. The contracting officer would make the final decision, based on a technical report of the USAFE Fuels Facilities Engineer as to whether the evidence furnished by the contractor qualified him for the job. The work was identified as difficult and hazardous, and the specifications stated it was mandatory that only specialized firms be invited to participate.

Subcontractors were authorized, and any such firms were to be identified within 7 days after award. Prior written consent of the contracting officer was required for subcontracts aggregating or amounting to $100,000 or more. The standard articles included the clause relative to progress charts and requirements for overtime work (Jan. 1965).

Ten proposals were received. At opening on October 21, 1970, plaintiff's bid of DM 7,464,910 was second lowest. Negotiations were held with the two low bidders. Plaintiff, who was not qualified to do the epoxy coating, based its bid on a quotation from Firm Schade, a firm on the USAFE/MOD/NATO approved lists. Plaintiff's bid included DM 1,220,000 for the epoxy coating work. During the negotiations, Jordan told the contracting officer's representative (COR) that its price was based on a bid from Firm Schade, that if it was awarded a contract it probably would use Firm Schade as its subcontractor, and that no firm commitment had been made with Firm Schade.

As a result of the discussions, changes were made in the specifications. Jordan contacted and received bids for the epoxy coating work from two firms, Firm Kloeckner and Firm Schmutz, which were not on the approved list. Jordan submitted a new lump sum bid, without a breakdown for individual items, of DM 5,488,000. This bid was the low bid and the contract was awarded on February 8, 1971, in that amount.

Jordan submitted a partial list of subcontractors on March 1, 1971, that did not include or identify a subcontractor for the epoxy coating work. On April 13, 1971, Jordan submitted an itemization of its lump sum price. This breakdown showed DM 661,800 for interior coating of the two tanks. On April 30, 1971, Jordan identified Firm Kloeckner as its intended epoxy coating subcontractor. From April 20, 1971, through December 13, 1971, Jordan sought to have Firm Kloeckner, or Firm Schmutz, approved as its subcontractor. The ASBCA found that Firm Kloeckner did not meet the qualifications/experience requirements set forth in the contract, and that Firm Schmutz did not possess the qualifications required of the interior coating contractor.

On November 24, 1971, the contracting officer confirmed oral advice about the four firms on the approved list, provided the names and addresses of those firms, reminded Jordan that it was responsible for timely completion of the work and for selection of subcontractors, and urged Jordan to name a qualified firm within 10 days. At a meeting on December 13, 1971, the parties concluded that Jordan should select one of the four approved firms. Jordan contracted with Firm Tarev, one of the four, and formal approval was given by the contracting officer on January 28, 1972.

On January 10, 1972, Jordan requested a price increase of DM 523,680, the difference in price between Firm Kloeckner and Firm Tarev. The contracting officer's final decision on February 3, 1972, denied this request.

The disputes clause in the contract authorized an appeal to the USAREUR–BCA, and a further appeal to the Secretary for claims that exceeded $50,000. Jordan appealed to the USAREUR–BCA for additional costs resulting from the government direction to use one of the four approved tank interior coating contractors, including expenses incurred as a result of delays in the work. The hearing officer found Jordan was entitled to an equitable adjustment of DM 429,616 for a constructive change on the subcontractor issue and for delay expenses. Three members of the board denied an adjustment for a constructive change on the subcontractor issue, but sustained the claim for delay costs in the amount of DM 26,480.

In its appeal to the ASBCA, Jordan attempted to limit its claim to the USAREUR–BCA ruling on the subcontractor issue and to exclude the DM 26,480 award for delay costs. The appeal to the ASBCA, however, was a de novo proceeding, and, although the evidence was limited to the record before the USAREUR–BCA, the composition of that board was irrelevant, and its decision was not binding.

The ASBCA determined that the contract authorized the contracting officer to allow Jordan multiple attempts to qualify its proposed subcontractors. The board found, however, that by December 1971, maintenance of the time schedule left the contracting officer no choice but to direct the use of one of the four firms known to be qualified. The ASBCA determined that the contracting officer did not take an undue amount of time to approve or disapprove the proposed subcontractors, and that Jordan was not entitled to a constructive change on the subcontractor issue. The ASBCA concluded that the constructive change claim and the delay claim were inextricably intertwined factually, and held that Jordan was not entitled to any additional money by reason of any delay. The ASBCA concluded the USAREUR–BCA erred in its award of DM 26,480 for delay costs.

Jordan filed its claims in this court on October 24, 1983. An order on procedures applicable to a Wunderlich Act review was entered on March 21, 1984, and the administrative record of the ASBCA was filed April 23, 1984. Briefing was interrupted pending disposition of defendant's motion to disqualify plaintiff's counsel. This matter was resolved on October 7, 1985.[4] Briefing on the appeal from the ASBCA decision was completed on February 21, 1986.

## DISPOSITION

Plaintiff's complaint requests a de novo review on the existing record, and its brief presents argument from facts restated, with differences, from those found by the ASBCA. The procedural order directed Jordan to list separately each finding of fact it challenged under 41 U.S.C. § 321, and to state the reasons the administrative finding was not entitled to finality, supported by appropriate citations to the record. This plaintiff has not done. In effect, plaintiff seeks to set aside facts as found by the board and have the court substitute facts plaintiff believes the board should have found. Plaintiff does not take cognizance of the scope of review authorized by the Wunderlich Act and established precedent.

■ The scope of review by this court of the ASBCA decision is defined by statute. The ASBCA findings on disputed facts are conclusive and binding on the court, unless the finding of fact is fraudulent, capricious or arbitrary, or so grossly erroneous as to imply bad faith, or it is not supported by substantial evidence.[5]

Supreme Court precedents define the content of the scope of review. There can be no trial de novo on issues of fact proper-ly before the board; judicial review of the board's fact-finding is confined to the record presented to the board.[6] When a board properly has the dispute before it, and the board fails to reach and decide the issue, remand to the agency to resolve factual matters is appropriate unless the unavailability of administrative relief clearly appears.[7] When the board's findings of fact are made in a case within its jurisdiction, the factual issues resolved by the board are binding on a court in a subsequent action for breach of contract, or in any collateral proceeding when the same facts are in issue.[8]

■ In a review of the board's findings of fact, the primary task for the court is to determine whether substantial evidence exists in the record to support the finding. The Court of Claims, guided by an analysis of classic opinions of the Supreme Court and of its own precedents, defined the content of the substantial evidence rule in *Koppers.*[9]

■ The standard of review in a Wunderlich Act case goes to the reasonableness of the agency action on the basis of the record before it; and substantial evidence is more than a scintilla, it is evidence that affords a reasonable basis for inference of the fact in issue.

In *Koppers,* the Court of Claims established the following standards:

*Substantial* evidence is evidence which could convince an unprejudiced mind of the truth of the facts to which the evidence is directed.

Reasonable inferences fairly drawn from the evidence are for the administrative tribunal. Where two equally reasonable but contrary inferences might be drawn from the record, and each could be sustained as supported by substantial

**4.** *Max Jordan Bauunternehmung v. United States,* 8 Cl.Ct. 793 (1985).

**5.** 41 U.S.C. § 321 (1982).

**6.** *United States v. Carlo Bianchi & Co.,* 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963).

**7.** *United States v. Anthony Grace & Sons, Inc.,* 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966).

**8.** *United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966).

**9.** *Koppers Co. v. United States,* 405 F.2d 554, 557, n. 5 (1968).

evidence, the one adopted by the Board should be sustained.

If an administrative board has failed to make a relevant finding of fact and the evidence relating to this fact question is *undisputed*, [the court] may make a *supplementary* finding without returning the case to the board. Analogously, where the evidence is *disputed* but the overwhelming weight of the evidence strongly points to one conclusion of fact, [the court] may make a necessary *contrary* finding without returning the case to the board, to obviate what would otherwise become "an empty ritual [which] has no place in a rational decision-making process".

If there is adequate and substantial evidence to support either of two contrary findings of fact, the one adopted by the Board is binding on the court, whatever [its] own evaluation of the evidence might be.[10]

■ Under the Wunderlich Act, the board's determinations on questions of law are not final and are not binding on the court.[11] The board's decisions, however, are entitled to careful consideration. Decisions of law made by the board will be credited when they are reasonable and are based on the board's expertise.[12]

■ In the course of its appeals through the USAREUR–BCA and the ASBCA, Jordan changed its emphasis on various aspects of these claims, and its final arguments in this court present new matters that were not raised previously. Jordan now argues that the specifications governing selection of subcontractors for interior tank coating were latently defective, unduly restrictive, and without reasonable standards for application. These contentions involve an issue of law that was not presented to the ASBCA. It is well estab-

lished that a party is precluded from arguing on appeal an issue it did not raise before the board of contract appeals. Accordingly, this issue is not properly before the court.[13]

Nevertheless, Jordan's argument that the specifications were latently defective clearly is without merit. In its opinion, the ASBCA quoted the specification and its requirements were analyzed in detail. The standards established were applied and express findings were made as to those facts that applied to the failure of Jordan's subcontractors to meet those standards. Jordan spent months arguing that its proposed subcontractors met the standards established in the specifications. The findings of the ASBCA relative to application of the specification's requirements are supported by substantial evidence, and its analysis of those requirements legally is correct.

Jordan also argues that the ASBCA decision should not be accorded deference under Wunderlich Act standards because the board's review of a "cold record" without hearing the evidence does not involve an application of special expertise. This argument was not made to the board. In view of Jordan's specific waiver of the opportunity provided by the ASBCA to present new testimony and new evidence in a de novo proceeding, the failure to make this argument to the board is not surprising.

■ Jordan stipulated the case could be tried on the ancient USAREUR–BCA record; it may not now complain that the ASBCA did not hear the evidence. There is no rule that requires a board decision to be rendered by the individual who presided at the hearing.[14] The disposition of Jordan's claims on the basis of the previous administrative record does not alter the applicable standard of review. Nor does it

---

10. Id. at 558–59.

11. 41 U.S.C. § 322 (1982).

12. *Dale Ingram, Inc. v. United States,* 201 Ct.Cl. 56, 475 F.2d 1177, 1185 (1973); *H.N. Bailey & Assoc., v. United States,* 449 F.2d 376, 387 (Ct.Cl. 1971).

13. *Wm. F. Klingensmith, Inc. v. United States,* 731 F.2d 805, 807 (Fed.Cir.1984); *Ace Constr. Co. v. United States,* 185 Ct.Cl. 487, 401 F.2d 816, 823 (1968).

14. *Tri-Cor, Inc. v. United States,* 198 Ct.Cl. 187, 458 F.2d 112, 116 (1972).

derogate from the principle that the decision is entitled to deference because it reflects the application of the ASBCA's special expertise.

■ Jordan argues that the contracting officer was estopped to deny approval of its proposed epoxy coating subcontractors. This argument is raised on an unacceptably narrow construction of the contract: *i.e.*, since the qualifications/experience standards were stated to be applicable to proposed prime contractors, the requirements did not apply to subcontractors, and award of the contract to the prime estopped the contracting officer from applying the standards to proposed subcontractors.

The contract did not contain an explicit "flow down" provision to make the qualifications/experience standards apply if the prime contractor used a subcontractor to do this work. In its response to the solicitation, Jordan did not submit the data relative to surface treatment of tanks that was required by the technical specifications. The government, moreover, did not reject the bid as nonresponsive because of Jordan's failure to submit this data.

Jordan's construction of the contract would lead to an unreasonable result. Admittedly, it was incapable of doing the epoxy coating work, and it could not have received the prime contract if the qualifications/experience standards applied only to the prime contractor. It was awarded the prime contract, however, and if the standards did not apply to its subcontractor, as it now argues, it would be free to use a firm that was totally unqualified.

The ASBCA rejected a construction of the contract that would permit this result. It found that the contemporaneous construction of the contract provisions by both parties was that any subcontractor had to meet the specified qualifications/experience requirements. The board relied upon Court of Claims precedent to give effect to the parties' prior interpretation, and to effectuate the spirit and purpose of the provisions.[15]

Jordan contends the ASBCA erroneously applied the superior knowledge doctrine with respect to selection of a subcontractor from an approved list, and made related findings of fact that are not supported by substantial evidence. The doctrine of superior knowledge generally is applied to situations where: (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration; (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information; (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire; and (4) the government failed to provide the relevant information.

The information allegedly withheld from Jordan was that the qualifications/experience requirements of the specification were designed to limit selection to firms on the list approved by the Air Force. Jordan claims that defendant knew that the true requirement was for selection from an approved list, and that the contractor should have been so advised. Jordan also claims that the failure to disclose the superior knowledge that award of the interior coating work would be restricted to a firm on the approved list is a breach of contract obligations to deal fairly and in good faith.

Before the board, Jordan argued the superior knowledge doctrine applied on the basis of the decision in the *Helene Curtis* case.[16] In this court, Jordan contends that *American Ship Building* is a correct application of the doctrine under the circumstances of this case.[17] The board's analysis of *Helene Curtis* and its application of the superior knowledge doctrine to the facts of this case was correct. Jordan fares no better under the reasoning of *American Ship Building*.

**15.** *Dynamics Corp. of America v. United States,* 182 Ct.Cl. 62, 389 F.2d 424, 430 (1968); *Consolidated Diesel Elec. Co. v. United States,* 209 Ct.Cl. 521, 533 F.2d 556, 575 (1976).

**16.** *Helene Curtis Indus., Inc. v. United States,* 160 Ct.Cl. 437, 312 F.2d 774 (1963).

**17.** *American Ship Bldg. Co. v. United States,* 654 F.2d 75 (Ct.Cl.1981).

■ In *Helene Curtis*, the government was aware the contractor reasonably assumed it could perform the contract without utilizing a grinding process, yet because the government knew grinding was necessary and failed to so inform the contractor, the government was liable for breach of contract.[18] The government's liability for failure to provide information arises from a conscious omission to share superior knowledge it possesses in circumstances where it permits a contractor to pursue a course of action known to be defective. The government is under no obligation to volunteer information that is reasonably accessible from another source.[19]

In *American Ship Building* the government had no obligation to disclose information about overruns and delays in previous contracts because the specifications under the contract in issue were sufficient to show plaintiff what was required. There was no issue of defective or misleading specifications and no withholding of a vital fact affecting performance which the government knew plaintiff was unaware.[20]

■ In this case Jordan was not misled by the solicitation or the specifications. The solicitation set forth explicitly the nature of the work and the limitations on firms eligible to do the work. Prospective contractors were advised:

> The difficulties and hazards involved in this type of work for application of epoxy coating in aviation fuel storage tanks make it mandatory that only specialized firms be invited for such projects.

Jordan admittedly was not such a specialized firm, and it is obvious that any subcontractor it used would have to have the necessary specialization. Jordan was not misled by these specifications and was on notice of the type of specialized firm it would have to qualify as a tank coating subcontractor.

The ASBCA found, and cited record evidence that confirms fully the finding, that the existence of the approved list was well known and information as to the degree of specialization necessary for placement on that list was in the public domain. This information was readily available to plaintiff from sources outside the government. It is of no import that the contracting officer, in the final decision letter, erred as to the date after contract award on which Jordan was told of the approved list on which the four firms were identified. The board noted the incorrect factual statements in the final decision letter and considered the impact of that error in the context of the record as a whole. This error does not establish that the government consciously withheld superior knowledge that Jordan needed and which was not available elsewhere.

The ASBCA also concluded that another element of superior knowledge doctrine was not present on the facts. A critical element in the doctrine is that there must be a factual showing the government knew bidders were not in possession of the vital information and would not be able to learn about it before bidding. On the facts of this case, Jordan's proposal was based on a price supplied by a firm on the approved list, and Jordan led the government to believe it was going to use that contractor for the epoxy coating work. From all objective appearances, Jordan had the information as to the approved list and the names of the firms on the list before it submitted its bid. The evidence that supports the board's finding that the government did not withhold information that it knew Jordan needed is more than substantial.

Contrary to Jordan's assertions, the record does not establish that the development of the specification language, the existence of an approved list, and the ultimate direction for Jordan to select a firm

**18.** *Helene Curtis Indus., Inc. v. United States,* 312 at 774.

**19.** *H.N. Bailey & Assoc. v. United States,* 449 F.2d at 382–83.

**20.** *American Ship Bldg. Co. v. United States,* 654 F.2d at 79.

from the approved list, amounts to a breach of contract for failure to act in good faith. The specifications established qualifications/experience standards reasonably appropriate to contract safety objectives. The board found that the government did not take the position that only the four firms then on the list could be approved as acceptable. Jordan could use any subcontractor that could meet the qualifications specified. Jordan's problem was its insistence on presenting subcontractors which did not meet the requirements specified consumed so much of the performance time that the contracting officer had no alternative but to direct the use of a firm known to be qualified.

There is no evidence that supports Jordan's accusations of favoritism. The allegations that the Air Force Fuel Facilities Engineer played favorites in selecting contractors to be placed on the approved list or colluded in the manipulation of contractual procedures are without creditable foundation in the record.

 Jordan's claim of breach of contract is a device to avoid limitations on judicial review. This effort is ineffectual. Merely recasting a dispute which is subject to adjustment under the disputes clause into breach of contract language does not remove the disputed claim from the administrative jurisdiction or escape the finality of findings properly made by the board.[21]

Additional contentions advanced by Jordan in this court include: (1) the ASBCA erred in its finding that the contracting officer had no choice under the circumstances but to direct the use of one of the four known qualified firms in order to protect the contract performance schedule; (2) defendant's refusal to approve Jordan's proposed subcontractors was arbitrary; (3) the contracting officer's decision that Jordan's proposed subcontractors were not qualified was usurped by the Air Force Fuel Facilities Engineer; (4) the contracting officer's admission of liability was a government interpretation of the contract that is binding in subsequent proceedings; and (5) the delay claim was not before the ASBCA. Each of these contentions was reviewed thoroughly by the board, specific findings were made as to every relevant fact, and the board's conclusions of law were accompanied by reasoned analysis of applicable precedent. The board's findings of fact are supported by substantial evidence in the record, and its legal conclusions on these claims are correct.

The progress schedule called for the epoxy coating work to commence in December 1971 or January 1972. The contract's general provisions contained the standard progress charts article, which in subsection (b) authorized the contracting officer to take steps necessary to improve delayed work. Jordan had been unable to name a subcontractor that could qualify during a period from February 1971 to December 13, 1971. Plaintiff never submitted the name of a qualified firm and the contracting officer had no choice but to order the use of one of the four qualified firms on the Air Force list.

The contract specifically authorized the Air Force Fuel Facilities Engineer to participate in the review of subcontractor qualifications for the coating work; it intended him to play a substantial role in assuring compliance with qualifications/experience requirements. It is not legally objectionable for a nonparty to a contract to be given a role in the contract by the parties. A contracting officer may rely on information and analyses prepared by his subordinates, and may use these materials in reaching his own decision. In this case, the board found that the contracting officer was found to put his own mind to the problem and concluded that Jordan's proposed subcontractors were not qualified. The fact that the contracting officer accepted the views of his advisors does not mean that the decision was not his own.

**21.** *United States v. Utah Const. & Mining Co.,* 384 U.S. at 419–20, 86 S.Ct. at 1558–59; *Jefferson Const. Co. v. United States,* 183 Ct.Cl. 720, 392 F.2d 1006, 1010, *cert. denied,* 393 U.S. 842, 89 S.Ct. 122, 21 L.Ed.2d 113 (1968).

The board also concluded that when the contracting officer changed his view as to the qualifications of Jordan's proposed subcontractors, he also changed his view that Jordan would be entitled to an equitable adjustment. In any event, the ASBCA proceeding was a de novo proceeding, and the board is not bound by the decisions of the contracting officer. The determination of ultimate liability is not the province of the contracting officer, or even of the parties by stipulation. It is the province of the board and this court.[22]

The ASBCA properly had before it all of plaintiff's claims on this contract. The appeal to the board was de novo, both by reason of the disputes clause in the contract and by stipulation of the parties. The question of whether Jordan is entitled to retain the DM 26,480 awarded by the USAREUR–BCA on the delay claim was opened up, notwithstanding Jordan's attempt to exclude it on appeal. The facts relative to the delay claim were directly related to the constructive change claim. The same facts are involved; Jordan's alleged delay is based upon the contracting officer's actions in the denial of approval for Jordan's proposed epoxy coating subcontractors.

### CONCLUSION

On the basis of the foregoing, it is concluded that the opinion of the ASBCA was correct in fact and law. Plaintiff's motion for summary judgment is DENIED; defendant's cross-motion for summary judgment is ALLOWED. The Clerk is directed to dismiss the complaint. Costs to defendant.

---

**22.** *See Hegeman-Harris & Co. v. United States,* 194 Ct.Cl. 574, 440 F.2d 1009, 1013–14 (1971).