Edwin L. (Ted) ROGERS, Jr., Plaintiff,

v.

UNITED STATES, Defendant.

No. 326–89C.

United States Claims Court.

Dec. 19, 1991.

---

Edwin L. (Ted) Rogers, Jr., pro se.

Randall J. Bramer, Washington, D.C., with whom was Asst. Atty. Gen., Stuart M. Gerson, for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

■ This military pay, record review, case is before the court on the parties' cross-motions for summary judgment.[1] Jurisdiction is premised herein on 28 U.S.C. § 1491(a)[2] and 10 U.S.C. § 1552.[3] The

---

**1.** The defendant also filed an alternative motion to dismiss for lack of jurisdiction under RUSCC 12(b)(1). However, defendant apparently raises that issue in passing only, inasmuch as it has failed to proffer any supporting argument. Given the foregoing, we find that the defendant has abandoned its motion to dismiss. In any event, we note that the court does not lack jurisdiction in this matter. It is a well-settled principle of law that the Claims Court has jurisdiction over military pay cases involving parties who allege that they are due back pay because a military correction board violated its statutory mandate in failing to correct legal and factual errors in the record, and/or removing prejudicial injustices. *See, e.g., Sanders v. United States,* 219 Ct.Cl. 285, 297, 594 F.2d 804, 811 (1979); *Heisig v. United States,* 719 F.2d 1153, 1155 (Fed.Cir. 1983), and cases cited therein.

**2.** 28 U.S.C. § 1491(a) states in part that:
(1) The United States Claims Court shall have jurisdiction to render judgment upon any

claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department....
(2) To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just....

**3.** 10 U.S.C. § 1552 provides in pertinent parts that:

(a)(1) The Secretary of a military department may correct any military record of the Secre-

plaintiff, Edwin L. "Ted" Rogers, Jr., is a former serviceman who was given an *involuntary* honorable discharge from active duty in the United States Army in December 1982 for the reason that he was determined to be a "DRUG ABUSE–REHABILITATION FAILURE," based on four previous 1982 positive urinalysis tests, three of which were later determined to be either *legally or scientifically unsupportable.* Accordingly, Mr. Rogers, who is appearing *pro se,* claims that his so-called honorable discharge was wrongful in that the Army Board for the Correction of Military Records (ABCMR) acted arbitrarily, capriciously, with an abuse of discretion, without substantial evidence, and contrary to law on at least two occasions. First, the ABCMR erroneously failed to reinstate him to active duty and award him back pay and full benefits, when, after determining that any "[c]ontinued reference to the unsupportable urinalyses would be prejudicial and improper," the ABCMR proceeded to justify its unfavorable decision at least, in part, on one or more of the three prejudicial urinalyses when it stated in its conclusions that—

He was declared a rehabilitation failure on the basis of *several* positive urinalyses, *at least one* of which has been found supportable.

(emphasis added). And, secondly, the ABCMR was arbitrary and capricious in that it abused its discretion in failing to grant plaintiff a due process hearing, contrary to law, because on his discharge papers the expressed reason noted for his discharge—DRUG ABUSE–REHABILITATION FAILURE—portrayed stigmatizing or derogatory information on its face. As a consequence, Mr. Rogers now seeks an order of reinstatement to active duty and awarding him all appropriate back pay and benefits inuring therefrom.

Conversely, the United States, acting through the Department of the Army (defendant), contends that in examining the decision of the ABCMR, this court will find that the ABCMR decision was neither arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, nor contrary to law. In addition, it avers that the Army followed all applicable statutes and regulations when making its decision to discharge Mr. Rogers from military service. For the reasons hereinafter expressed, the plaintiff's motion is GRANTED, and the defendant's motion is concomitantly DENIED.

## FACTS

Mr. Rogers enlisted in the Army on January 9, 1978, on a delayed enlistment program and was later assigned to the 296th Army Band as a guitar player on March 14, 1979. On June 2, 1979, while stationed in Honshu, Japan, he was apprehended for driving under the influence of intoxicating liquor (*i.e.,* drunk driving) and was subsequently referred to the Command Drug and Alcohol Program. The program, now termed the Alcohol and Drug Abuse Prevention and Control Program (ADAPCP), is designed to provide soldiers with regular counseling and evaluations to prevent them from becoming alcohol or drug dependent, and to rehabilitate those soldiers who demonstrate such problems. Army Regulation (AR) 600–85, ¶ 4–25 (1981). Mr. Rogers was released from that program after the Army determined that "he did not exhibit a need for further treatment." (Report of

tary's department when the Secretary considers it necessary to correct an error or remove an injustice. Except as provided in paragraph (2), such corrections shall be made by the Secretary acting through boards of civilians of the executive part of that military department. The Secretary of Transportation may in the same manner correct any military record of the Coast Guard.

\*    \*    \*    \*    \*    \*

(c) The Secretary concerned may pay, from applicable current appropriations, a claim for the loss of pay, allowances, compensation, emoluments, or other pecuniary benefits, or for the repayment of a fine or forfeiture, if, as a result of correcting a record under this section the amount is found to be due the claimant on account of his or another's service in the Army, Navy, Air Force, Marine Corps, or Coast Guard, as the case may be. If the claimant is dead, the money shall be paid, upon demand, to his legal representative....

Administrative Discharge Proceedings, p. 4.)

Approximately three years later, on or about May 17, 1982, the Army conducted a 100% urinalysis survey within the 296th band unit. As a consequence of said testing, Mr. Rogers was identified through chemical analysis as a "substance abuser," *i.e.,* a marijuana user. (*Id.*). Additional evidence of illegal marijuana use was again detected through unannounced urinalysis tests conducted on June 8 and 14, 1982. Consequently, Mr. Rogers was referred and admitted to the ADAPCP for a second time on June 21, 1982. Thereafter, on or about July 7, 1982, a team meeting was held whereby Mr. Rogers agreed to abstain from all illicit drug use and alcohol consumption during the course of his rehabilitation program. However, in a counseling session on July 14, 1982, Mr. Rogers admitted to consuming alcohol on July 10 and 11, 1982, in violation of the ADAPCP treatment agreement which he had signed only a few days earlier. In light of this circumstance, and the fact of the prior incident of drunken driving in 1979, the counselors agreed that Mr. Rogers should begin to take the drug Antabuse as a part of his treatment.[4]

In late September or early October (*i.e.,* on or about October 1, 1982), the fourth unannounced urinalysis tests were conducted in plaintiff's unit. The results of this test survey, again indicating that Mr. Rogers was an illegal drug user, were received by the Army on October 27, 1982. While, prior to the receipt of the October 1 urinalysis tests results, the counselors at ADAPCP described Mr. Rogers, in his first progress report dated September 29, 1982, as a patient who was not making progress towards rehabilitation, they nevertheless failed to make any recommendations regarding separation or retention. Within a week thereafter, however, the counselors determined—that Mr. Rogers' progress was unsatisfactory; that he had completed the program; and that he should be released from said program by administrative discharge for "alcohol or drug related" purposes.[5]

Accordingly, after the acting commander consulted with the rehabilitation team, he determined that Mr. Rogers was a rehabilitation failure, and made his final decision on October 4, 1982, to separate him from military service.[6] Two days later, therefore, on October 6, 1982, Mr. Rogers received notice that the Army intended to separate him with an honorable discharge on the basis that he was an ADAPCP rehabilitation failure.[7] Mr. Rogers responded in a letter dated October 15, 1982, contending, *inter alia,* that his treatment in the ADAPCP was not in accordance with AR 600–85 and that the Army's subsequent determination of "drug rehabilitation failure" was also not in accordance with Army regulations. Nevertheless, on November 2, 1982, the Army concluded, on review, that the 296th band unit would no longer benefit from the retention of Mr. Rogers,

---

4. "While the use of Antabuse is medically recognized as being of chemotherapeutic value in the treatment of alcoholism, it will not be a mandatory requirement of the Army rehabilitative program.... This policy is not to discourage the use of Antabuse when appropriate and prescribed by a physician." AR 600–85, ¶ 4–15(b) (1981).

5. These results were detailed on an October 5, 1982 ADAPCP Client Progress Report completed by the ADAPCP counselors. The actual reason was, of course, Drug Abuse–Rehabilitation Failure. *See* Form DD 214.

6. Under AR 600–85, when a commander, in consultation with the rehabilitation team, determines that duty performance and progress are unsatisfactory, and that rehabilitation efforts are unjustified, then a soldier's separation from military service may be effected. *See* AR 600–85 ¶ 4–8(b) and ¶ 4–25. For enlisted personnel, AR 635–200 governs the termination of soldiers who are found to be either drug and alcohol abusers and/or have failed to complete the ADAPCP program because "there is a lack of potential for continued Army service and rehabilitation efforts are no longer practical...." AR 635–200 ¶ 9.2(a).

7. Under AR 635–200 Chapter 9, the commander is required, *inter alia,* to give the soldier notice in writing that he is to be separated from military service because of alcohol or drug abuse related causes. *See* ¶ 9–3(a). In addition, the soldier is granted certain rights including, *inter alia,* the right to submit statements on his own behalf. *See id.*

nor would his retention benefit the United States Army. Therefore, Mr. Rogers was formally recommended for separation from the U.S. Army, which was approved on November 30, 1982. On December 16, 1982, Mr. Rogers was honorably discharged prior to the normal expiration of his enlisted term, which would have been March 13, 1983.[8] Although Mr. Rogers received an ostensibly honorable discharge, his discharge certificate, Form DD 214, disclosed by separation code, and by narration, that the discharge was due to "DRUG ABUSE–REHABILITATION FAILURE."

Thereafter, and on an unspecified date in 1983, the record shows that a "Blue Ribbon Panel" of experts in toxicology and drug testing was established by the government[9] to evaluate the scientific and administrative procedures used in testing urine specimens at Army laboratories. The report of the panel, dated December 12, 1983, Review of Urinalysis Drug Testing Program, concluded that the testing procedures used by all of the laboratories were adequate to identify drug abuse and found no significant evidence of false positive urinalysis reports. However, the panel did find that a percentage of the positive urinalysis reports "was not scientifically or legally supportable for use in disciplinary or administrative actions." Consequently, a "Urinalysis Records Review Team" consisting of military chemists and lawyers was formed by the Army to scrutinize all positive urinalysis reports obtained between April 1982 and October 1983.

The test *results* obtained from Mr. Rogers' urine specimens on May 17, June 8, and June 14, 1982, were all reviewed, and the Urinalysis Records Review Team determined therefrom that there were egregious deficiencies in either the scientific test procedures, the chain of custody documents, or both. Therefore, the review team and the ABCMR determined that any allegation of drug use by Mr. Rogers based on any of the three reports would not be legally or

scientifically supportable in connection with adverse administrative or disciplinary actions. On the other hand, a review of the positive test results of the urine specimens obtained from Mr. Rogers on or about October 1, 1982, revealed that this urinalysis report was supportable and sufficient to serve as a basis for appropriate administrative action as a rehabilitation failure.

Following his discharge, Mr. Rogers filed a petition with the ABCMR requesting—that the defective urinalysis reports be deleted from his records; that all references to the adverse administrative actions taken as a result of those defective reports be deleted from his records; that his discharge be voided; and that he be restored to active duty with all appropriate back pay and benefits. On June 25, 1986, the ABCMR granted plaintiff's petition in part, and denied it in part. In that connection, the ABCMR concluded that:

1. The positive urinalyses of the specimens submitted by [Mr. Rogers] on 17 May, [and on] 8 and 14 June 1982 were either legally or scientifically unsupportable and could not rightfully serve as the basis for adverse administrative or disciplinary action;

2. *Continued reference to the unsupportable urinalyses would be prejudicial and improper.* Accordingly, it would be in the best interest of justice to delete from his military personnel and medical records, any and all references to the positive urinalyses of the specimens he submitted on 17 May, and on 8 and 14 June 1982; and

3. The applicant was properly referred to the ADAPCP for treatment and rehabilitation. He was declared a rehabilitation failure on the basis of several positive urinalyses, at least one of which has been found supportable. Accordingly, that declaration, and the discharge that was based upon it, were

---

8. "A serviceman does not have a right per se to remain in service until the expiration of his enlistment." *Birt v. United States*, 180 Ct.Cl. 910, 913 (1967).

9. The Surgeon General of the Army made the appointments pursuant to directives from the U.S. Congress and the Secretary of the Defense.

proper. There is no reason to reverse either of these actions.

(Emphasis added).

Accordingly, the Board recommended: (i) that "all Department of the Army records related to this case be corrected by deleting from military personnel and medical records ... any and all references to the urinalysis of the specimen submitted on May 17, and on 8 and 14 June, 1982"; and (ii) that all of Mr. Rogers' remaining requests be denied. As a consequence of the conclusions and recommendations of the ABCMR, *i.e.*, "at least one of [the several positive urinalyses] ... has been found supportable," Mr. Rogers' declaration to be a drug rehabilitation failure and the discharge based thereon without a hearing "were proper." Mr. Rogers is presently before this court seeking reinstatement to active duty, correction of his records, and all monetary awards and other benefits to which he is entitled.

## CONTENTIONS

Generally, Mr. Rogers alleges that the ABCMR acted arbitrarily, capriciously, with an abuse of discretion, without substantial evidence, and contrary to law in failing to restore him to active duty with all appropriate pay and privilege entitlements. In this regard, plaintiff strenuously argues that he was denied fundamental due process of law, was subjected to cruel and unusual punishment, and was deprived of the right to liberty in his pursuit of a livelihood. He further contends that he was enrolled in the ADAPCP program in violation of applicable regulations; that the Army did not give him treatment in accordance with those regulations; and that his separation was wrongful in light of the fact that the decision was based at least in part on one or more of the three defective urinalysis tests that were subsequently deleted from his record because they were legally or scientifically unsupportable of any administrative or disciplinary action.

Conversely, the defendant, of course, contends that we should affirm the ABCMR's decision simply because the Board's actions were neither arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, nor contrary to law.

## DISCUSSION

Pursuant to RUSCC 56(c), a judgment on a motion for summary judgement is generally mandated "if ... there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In this connection, judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* Initially, the movant has the onerous burden of showing that there are no issues of material fact and that it is entitled to judgment as a matter of law. *Id.* at 323, 106 S.Ct. at 2552. The non-movant, on the other hand, must respond by producing affirmative evidence that a genuine issue of material fact does exist because an issue is determined to be *"genuine* only if, on the entirety of the record, a reasonable jury could resolve a factual matter in favor of the non-movant." *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir. 1987). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("... if the evidence is such that a reasonable jury could return a verdict for the non-moving party."). Once both parties have sufficiently set forth their positions, the court will then ask—whether reasonable jurors could find by a preponderance of the evidence that the movant has met his burden and is entitled to a judgment as a matter of law. *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. If so, the court may grant the motion for summary judgment.

Given these well-established guideposts, and after a careful review of all of the parties' submissions, premised on the administrative record, we are compelled to conclude, on the indisputable material facts here, that this case is ripe for summary

judgment. This is clearly true since the material facts in issue are based predominately upon the record established in the proceedings before the ABCMR. Thus, utilizing those indisputable facts, we need only look to the relevant areas of the law to make our determination. Accordingly, the question now before the court is whether the action of the ABCMR in denying the plaintiff relief was arbitrary, capricious, unsupported by substantial evidence. or contrary to law.[10]

A. *The Standards of Review*

■ It is well settled that the responsibility for determining who is fit or unfit to serve in the armed services lies with the military and not with the judiciary. *Orloff v. Willoughby,* 345 U.S. 83, 93–94, 73 S.Ct. 534, 539–40, 97 L.Ed. 842 (1953). Although we may disagree with a correction board's decision, "we will not substitute our judgment for the board's when reasonable minds could reach differing conclusions." *Sanders v. United States,* 219 Ct.Cl. 285, 302, 594 F.2d 804, 814 (1979). Moreover, Court of Claims and Federal Circuit case law, both binding precedent on this court, have summarized our review jurisdiction in military pay cases as follows:

> [R]eview of the administrative decision is limited to determining whether the action was arbitrary, capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation, or mandatory published procedure of a substantive nature by which [the complainant] has been seriously prejudiced.

*Heisig,* 719 F.2d at 1156; *Clayton v. United States,* 225 Ct.Cl. 593, 595 (1980). In addition, the predecessor Court of Claims has clearly held in *Sanders,* and on other numerous occasions, that:

> Once a plaintiff has sought relief from the Correction Board, such plaintiff is bound by that Board's determination un-

less he can meet the difficult standard of proof that the Correction Board's decision was illegal because it was arbitrary, or capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation, or mandatory published procedure of a substantive nature by which plaintiff has been seriously prejudiced, and money is due.

*Sanders v. United States,* 219 Ct.Cl. at 298, 594 F.2d at 811. The court has also held therein that:

> To recover for failure to correct an alleged injustice, such as perhaps based on gross material error of fact or an action contrary to all evidence, it must be proved that such failure was arbitrary and capricious, or in bad faith, or contrary to law, or without rational basis, seriously prejudicial to plaintiff, and with monetary consequences. In such event, *the abuse of administrative discretion rises to the level of legal error which merits judicial relief.*

219 Ct.Cl. at 301–302, 594 F.2d at 813. (emphasis added).

■ Finally, the predecessor Court of Claims has set forth a standard of proof whereby the claimant must demonstrate that the Board's actions are arbitrary or unsupported by substantial evidence by proffering evidence which is "cogent and clearly convincing." *Cooper v. United States,* 203 Ct.Cl. 300, 304–305 (1973). The quantum of required evidentiary proof is high because the plaintiff, of course, "must overcome a strong, but rebuttable, presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully and in good faith." *Sanders,* 219 Ct.Cl. at 302, 594 F.2d at 813. In addition, there are strong policies which compel the court to allow the armed services the widest possible latitude in administrating their personnel matters.[11]

10. This court cannot overturn the decisions of the ABCMR unless they are found to be arbitrary, capricious, and not based upon substantial evidence, or are contrary to applicable laws and regulations. *Grieg v. United States,* 226 Ct.Cl. 258, 269, 640 F.2d 1261, 1268 (1981), *cert. denied,* 455 U.S. 907, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982), *citing Cooper v. United States,* 203 Ct.Cl. 300, 304–305 (1973).

11. The standard of review in military discharge cases is one of great deference. *Brown v. United States,* 184 Ct.Cl. 501, 503, 396 F.2d 989 (1968). Thus, the scope of this court's review is very narrow. *See Bockoven v. Marsh,* 727 F.2d

*Id.* As a consequence, and against this stringent background, we observe that it is a rare case where the plaintiff can overcome these heavy burdens. *See, e.g., Doggett v. United States,* 207 Ct.Cl. 478, 483 (1975); *Skaradowski v. United States,* 200 Ct.Cl. 488, 471 F.2d 627 (1973); *Hertzog v. United States,* 167 Ct.Cl. 377, 383–384 (1964). Therefore, in reaching our ultimate conclusion, on this record, we were, of course, mindful of the foregoing standards and restrictions. We now turn to the two definitive issues presented in this case.

## B. *The Issues and Conclusions*

As previously seen, the broad threshold issue before the court is—whether the ABCMR acted arbitrarily, capriciously, with an abuse of discretion, without substantial evidence, or contrary to law to the end that plaintiff has been seriously prejudiced when it refused, on this record, to reinstate Mr. Rogers to active duty with all appropriate back pay and benefits. Within this broad issue are two narrower issues, one being—whether the ABCMR should have reinstated Mr. Rogers with back pay and benefits in light of prevailing Army regulations requiring that the Army follow certain procedures prior to discharging a member for alcohol or drug related reasons; [12] and the second being—whether Mr. Rogers was deprived of the full benefits of procedural due process where the expressed reason for his involuntary discharge was "DRUG ABUSE–REHABILITATION FAILURE," and he was denied the opportunity to defend himself in some reasonable forum equating to an adversarial hearing.[13]

We find with regard to the first issue that, in light of the facts that (1) AR 600–

85, *inter alia,* indicates that "rehabilitation begins" when alcohol or drug abuse is identified, and (2) the Board concluded that the May 17, June 8 and June 14, 1982 positive urinalysis tests used to support Mr. Rogers' involuntary separation from the Army were determined, *ab initio,* not to be legally or scientifically supportable of *any* type of administrative or disciplinary action, let alone one as grave as this, the Board should have reinstated Mr. Rogers to active duty with back pay and benefits. Moreover, on these facts, the ABCMR should have also recommended that the Army reenroll him in the ADAPCP program for an appropriate period consistent with applicable regulations, this time based on the *one and only* supportable positive urinalysis test, *i.e., the October 1, 1982 urinalysis test.*

Turning to the second issue, we find that inasmuch as Mr. Rogers' Form DD 214 discharge certificate contained the coded letters "JPC(JKK)," indicating that the reason for his separation from service was drug related, and that the certificate's narrative reason for separation was explicitly noted as—"DRUG ABUSE–REHABILITATION FAILURE," a "stigma" attached to Mr. Rogers' discharge entitling him to an appropriate adversarial hearing before the Army may properly discharge him based on the egregious stigmatizing facts stated on his certificate. In reaching our decision, we relied—on the decision in *Casey* which specifically held that a "discharge for drug and alcohol abuse casts a stigma on the plaintiff," and on the well-established holding set forth in our predecessor court, *Keef v. United States,* 185 Ct.Cl. 454, 467

---

1558, 1566 (Fed.Cir.), *cert. denied,* 469 U.S. 880, 105 S.Ct. 245, 83 L.Ed.2d 183 (1984); *Murray v. United States,* 9 Cl.Ct. 71, 74 (1985). This is especially true in light of the fact that the Supreme Court emphasized in *Gilligan v. Morgan,* 413 U.S. 1, 10, 93 S.Ct. 2440, 2445, 37 L.Ed.2d 407 (1973), that courts must exercise deference with respect to military judgments because "it is difficult to conceive of an area of governmental activity in which the courts have less competence."

**12.** *See generally,* AR 635–200 and AR 600–85.

**13.** *See Casey v. United States,* 8 Cl.Ct. 234, 241 (1985). In *Casey,* a service member was discharged from the Army for alcohol rehabilitative failure. The member's discharge papers, Form DD–214, indicated by coded designation that the member was discharged for "personal abuse of alcohol and other drugs." Consequently, the court determined that a "stigma" attached to the plaintiff's discharge and that in light of this fact the member was entitled to a hearing prior to his discharge.

(1968),[14] which held that *"notice and a hearing ... are required ... if the discharge,* albeit honorable, *either casts a stigma on the serviceman or has some derogatory connotation"* (emphasis added). Accordingly, in light of *Keef* and *Casey,* we find that, because the Army failed to grant, and the ABCMR failed to order, an appropriate hearing of any form, Mr. Rogers' right to procedural due process was violated, and that the Army committed legal error in discharging him as it did.

Therefore, for the foregoing reasons and as explicated hereinafter, we are constrained to conclude that the ABCMR acted arbitrarily, capriciously, with an abuse of discretion, without substantial evidence, and contrary to law in that—(i) it refused to reinstate Mr. Rogers to active duty with back pay and benefits, in light of the fact that he was prematurely placed in the ADAPCP program, that is, before he was legally identified as a drug user on October 27, 1982; and (ii) it failed to determine that the Army acted illegally in not granting Mr. Rogers at least a minimal adversarial hearing before separating him from military service, based on the "stigma" attached to his discharge. We next discuss these issues seriatim.

## C. *Analysis—Did The ABCMR Act Arbitrarily?*

### Issue # 1—Did The ABCMR Fail To Consider Army Regulations?

■ It is cogently clear, given this record, that the ABCMR failed to properly consider the Army regulations set forth in AR 600–85 and AR 635–200, and in so doing, acted arbitrarily, capriciously, with

an abuse of discretion, without substantial evidence, and contrary to law. We are compelled to reach this conclusion, notwithstanding the fact that the Board granted Mr. Rogers partial relief, because we find that the evidence is clear and convincing that the Board failed to grant him the *full* relief to which he was entitled.[15] First, upon a review of the ABCMR's actions during its proceedings, as reflected in the administrative record, we find that the ABCMR acted correctly in concluding that the results of the positive urinalysis specimens taken on May 17, June 8, and June 14, 1982, were "either legally or scientifically unsupportable." Additionally, the Board acted properly when it went on to say—that these results "could not rightfully serve as the basis for adverse administrative or disciplinary actions"; that any *"[c]ontinued reference to the unsupportable urinalysis would be prejudicial and improper"*; and that "it would be in the best interest of justice to delete from [Mr. Rogers'] military personnel and medical records, any and all references to the positive urinalysis of the specimens submitted on 17 May, and on 8 and 14 June 1982."

### a. *AR 600–85*

■ Notwithstanding the foregoing correct determinations, the Board, in deciding whether to reinstate Mr. Rogers to active duty with back pay and benefits, failed to *fully* consider the applicable Army regulations, AR 600–85 and AR 635–200, as well as give recognition to the "changed" circumstances under which he was discharged. More specifically, AR 600–85, entitled Alcohol and Drug Abuse Prevention and Control Program, "prescribes policies

---

**14.** The court in *Keef* applied the applicable "stigma" language in the instance where a plaintiff was discharged because he was allegedly homosexual. His papers indicated that he was discharged for "unique and unusual circumstances" and noted by code that he was not entitled to re-enlistment. Later, this court in *Casey,* consistent with the foregoing authorities, applied the "stigma" theory to instances where a plaintiff was discharged for alcohol and drug abuse. In *Casey,* the discharge papers also contained a coded designation "JPB" which stood for personal abuse of alcohol and other drugs. *Casey,* 8 Cl.Ct. at 241–143.

**15.** By now, it is hornbook law that the predecessor Court of Claims has previously held in *Sanders* that "where an applicant has convinced a correction board to correct his record, it *must* not grant him 'half-a-loaf' of relief." *Sanders,* 219 Ct.Cl. at 301, 594 F.2d at 813, *citing Debow v. United States,* 193 Ct.Cl. 499, 504, 434 F.2d 1333 (1970), *cert. denied,* 404 U.S. 846, 92 S.Ct. 150, 30 L.Ed.2d 84 (1971) (emphasis added). In short, he must be made "whole." *Ray v. United States,* 197 Ct.Cl. 1, 453 F.2d 754 (1972).

and procedures needed to implement, operate, and evaluate the ADAPCP." In Chapter 4, for example, entitled Rehabilitation, the regulations provide that "[R]ehabilitation begins when an individual is identified as being involved with alcohol and other drug abuse, or illegal use" (AR 600–85 ¶ 4–1(b)). In view of that provision, and given the total disqualification of the initial three urinalysis tests results, *supra*, Mr. Rogers was not, in truth, according to the regulations, identified as a drug user, on this record, until October 27, 1982, when the Army received the results of his "October 1, 1982" urinalysis. Therefore, rehabilitation could not have "begun" until sometime on or after October 27, 1982. Moreover, and in such circumstances, the regulations then go on to require that "[i]nitial efforts [to rehabilitate] should begin with counseling by the commander ..." and in special instances, where expertise is needed, the commander "will refer the individual to the ADAPCP for screening and professional assistance as required." *Id.* In addition, once Mr. Rogers has been referred to and enrolled in the ADAPCP program, the regulations provide that he would be taken through a "rehabilitation process" consisting of such elements as (a) prevention and education, (b) identification and referral, (c) screening, medical evaluation, and command consultation, and lastly (d) rehabilitation treatment and follow-up. AR 600–85 ¶ 4–3. These steps are, of course, contemplated prior to any definitive recommendations or determination such as an involuntary discharge. This court has substantial misgivings in seeing how all of these elements could have been appropriately completed in six or seven days, that is, from the date the Army received the positive test results on October 27, 1982, the earliest time at which plaintiff could be identified as a drug user, to the date on which Mr. Rogers' administrative discharge proceedings took place, November 2, 1982. At that time it was formally recommended that plaintiff "be separated from the United States Army under the provisions of Chapter 9, AR 635–200, *as expeditiously*

*as possible*" (emphasis added). In fact, our predecessor court in *Birt v. United States*, 180 Ct.Cl. at 913, holds that "[although a] serviceman does not have the right per se to remain in the service until the expiration of his enlistment, ... removal prior to that time may be accomplished administratively ... and such action would be subject to invalidation by the judiciary only if it exceeded statutory authority ... ignored procedural rights ... or violated minimum concepts of fairness." Certainly, the foregoing facts indicate, at the very least, ignored procedural rights and/or a violation of minimum concepts of fairness by the ABCMR, and we so find.

More importantly, AR 600–85 ¶ 4–5(b)(2) specifically requires that *"Enrollment in this track [Track II] will be for a minimum of 30 days,"* with a view towards rehabilitation. Certainly this 30–day regulatory requirement could not have been met between the period of his identification (October 27, 1982) and the date recommended for discharge (*i.e.*, November 2, 1982).[16] Thus, based on this regulation, the Army could not have properly applied the above regulation(s) and conducted discharge proceedings against Mr. Rogers *as a drug rehabilitation failure* as of November 2, 1982, because he most probably would not have been properly enrolled in the program (ADAPCP) until sometime *on or after* October 27, 1982. Therefore, at the very earliest, Mr. Rogers would not have been eligible for release from the program until November 27, 1982, following "a minimum of 30 days" enrollment in Track II. The Board, therefore, acted contrary to its mandate, by failing to comply with its own regulations, when it concluded that Mr. Rogers was not entitled to reinstatement because he was *properly* classified as a drug abuse rehabilitation failure. Moreover, we deem the foregoing conduct to have imposed an injustice on plaintiff. In this connection, it has been held that "[w]hen a correction board fails to correct an injustice [and/or an error] clearly presented in the record before it, it is act-

---

**16.** Mr. Rogers' ADAPCP Client Progress Reports indicate that he was a Track II enrollee during

the time he prematurely participated in the program.

ing in violation of its mandate." *Muse v. United States*, 21 Cl.Ct. 592, 603 (1990), *citing Yee v. United States*, 206 Ct.Cl. 388, 397, 512 F.2d 1383 (1975).[17]

#### b. *AR 635-200*

In addition to the regulations set forth in AR 600-85, there is also the consideration of AR 635-200, entitled Personnel Separations–Enlisted Personnel. In these regulations, the Army sets out policies, standards, and procedures for insuring that all armed forces are operationally ready and competent, while at the same time providing orderly administrative separation procedures for a variety of reasons. AR 635-200 ¶ 1-1(a). Moreover, the regulation states that "reasonable efforts should be made to identify enlisted members who exhibit a likelihood for early separation, and to improve their chances for retention through counseling, retraining, and rehabilitation prior to initiation of separation proceedings." AR 635-200 ¶ 1-1(b). This process is undertaken, of course, because the Army makes a "substantial investment in training, time, equipment, and related expenses when persons enter into military service [and] separation prior to completion of an obligated period of service is wasteful because it results in loss of this investment and generates a requirement for accessions." *Id.* Accordingly, and to ameliorate the potential problem, the Army sets forth "guidelines on separation." The guidelines contained in Chapter 9 of AR 635-200 establish the procedures to be followed when separating a member for alcohol *or* other drug abuse reasons. *See generally*, AR 635-200 Ch. 9 ¶¶ 9-1 to 9-7.

According to the procedures set forth by AR 635-200 ¶ 9-1, "the commander determines that further rehabilitation efforts are not practical, rendering the member a rehabilitation failure. The determination will be made in consultation with the rehabilitation team. (See AR 600-85, ¶ 4-25)."

AR 635-200 ¶ 9-1(b). In this connection, turning to the facts at hand, Mr. Rogers' discharge was undoubtedly premature, to say the least, because the commander and the rehabilitation team, in determining that he was a drug abuse rehabilitation failure *on October 4 and 6, 1982*, relied exclusively on the May 17, June 8, and June 14, 1982 unsupportable positive urinalyses, when in fact, there was only a *single* positive urinalysis, *i.e., October 1, 1982*, with respect to which the Army had not received the positive results on the determination date, or until October 27, 1982. Moreover, the Army's regulations specify that "a member who has been referred to the ADAPCP for alcohol/drug abuse *may* be separated because of inability or refusal to participate in, cooperate in, or successfully complete such a program in the following circumstances: (1) there is a lack of potential for continued Army service and rehabilitation efforts are no longer practical, and (2) long-term rehabilitation is necessary and the member is transferred to a civilian medical facility for rehabilitation." According to the facts before us, Mr. Rogers was not unable to participate in the program, nor did he refuse to participate in the program, nor did he fail to cooperate with the rehabilitation team. Thus, the only remaining justification under AR 635-200 in which Mr. Rogers could be deemed a "rehabilitation failure" was that he failed to "successfully complete" the program. In this regard, it appears highly unlikely to the court that Mr. Rogers could have failed to "successfully complete" the ADAPCP program as determined on October 5, 1982, if, upon viewing the facts *ab initio*, he should not have entered the program until some time *on or after October 27, 1982.*[18]

This circumstance, we believe, gives rise to a "gross material error of fact or an action contrary to all evidence" where Mr. Rogers is determined to be a drug rehabili-

---

17. In any event, the Board should have recognized that Mr. Rogers was enrolled in an alcohol and drug prevention and control "program." Just the notation of the word "program" itself indicates that a series of acts or a sequence of operations must take place. *See Webster's New World Dictionary* 477 (pocket-size ed. 1979).

18. As previously indicated, Mr. Rogers was subject to formal discharge proceedings on November 2, 1982, only six or seven days after the Army received the test results from the October 1, 1982 urinalysis.

tation failure prior to the actual date he could have legally been *identified* as a subject for the ADAPCP. In failing to correct such an injustice, we believe, the ABCMR was arbitrary and capricious without a rational basis which seriously prejudiced plaintiff to the extent that such "abuse ... rises to the level of legal error which merits judicial relief." *Sanders*, 219 Ct.Cl. at 302, 594 F.2d at 811. Accordingly, upon viewing the facts *ab initio* as we must, the evidence is clear and convincing that the Board's determination not to reinstate Mr. Rogers to active duty with back pay is also not supported by substantial evidence [19] on the record as a whole. *See Snakenberg v. United States*, 15 Cl.Ct. 809 (1988), *citing Brewer v. United States*, 227 Ct.Cl. 276, 279, 647 F.2d 1093 (1981), 454 U.S. 1144, 102 S.Ct. 1005, 71 L.Ed.2d 296 (1982).

Focusing on the "changed" circumstances discussed previously, it would appear to the court that the operative facts as they *now* stand, viewed *ab initio*,[20] are that: (i) as a result of Mr. Rogers' *initial* urinalysis test, conducted on or about October 1, 1982,[21] he would have been *first* determined to be a marijuana user on or about October 27, 1982; and (ii) inasmuch as the May 17, June 8, and June 14, 1982 urinalysis tests must be deemed not to have occurred, Mr. Rogers would not have been referred and admitted to the ADAPCP for a second time on June 21,

1982. Whether Mr. Rogers would have been enrolled in the ADAPCP program shortly after October 27, 1982, on an *ab initio* analysis, is also questionable in light of the indisputable fact that the government did not previously enroll Mr. Rogers in the drug rehabilitation program until *after* he had failed a *total of three (3) urinalysis tests*.[22] However, even assuming that Mr. Rogers would have been immediately enrolled after the first supportable urinalysis, *i.e.*, October 1, 1982, and assuming further that the Army had the test results at that time, which, of course, it did not have until on or about October 27, 1982, as of October 6, 1982, the date on which he received his formal notification of discharge proceedings, Mr. Rogers would have at that time been in the program for a total of *only six or seven days*. This hardly would have been a sufficient amount of time to determine that plaintiff was a drug rehabilitation failure on the basis of the *only* efficacious evidence in the record, *i.e.*, the October 1, 1982 urinalysis test and the October 27, 1982 results therefrom. Thus, consistent with the Army's previous action, we are convinced and thus can only conclude, in view of the absence of substantial evidence, that it would not have executed the October 6, 1982 letter of notification of proposed separation based only on the single urinalysis test of October 1, 1982.

Against this background, therefore, we are constrained to hold that the Board

---

**19.** "[S]ubstantial evidence is more than a scintilla, it is evidence that affords a reasonable basis for [an] inference of the fact in issue." *Bauuterenehumng v. United States*, 10 Cl.Ct. 672, 676 (1986), *aff'd*, 820 F.2d 1208 (Fed.Cir.1987).

**20.** *Ab initio* is the latin term for "from the beginning, from the first act, or from the inception." *Black's Law Dictionary* 7 (5th ed. 1979).

In viewing the facts *ab initio*, the court is taking into consideration the fact that three of the four positive urinalyses, that is, the May 17, June 8 and 14, 1982 tests, were declared legally or scientifically unsupportable of any adverse administrative or disciplinary action; and accordingly, any and all events resulting therefrom, *i.e.*, the placement in (June 21, 1982) and subsequent release of Mr. Rogers from (October 5, 1982) the ADAPCP program, must also be deemed as unsupportable of any administrative or disciplinary action. It is as if these events

never occurred. Thus, all that supports the involuntary honorable discharge is the October 1, 1982 urinalysis and the October 27, 1982 positive results.

**21.** The records as to the exact date of the last urinalysis are very sketchy. It appears to be sometime in late September or early October, 1982.

**22.** According to the actual facts as they unfolded, Mr. Rogers was enrolled in the ADAPCP for drug abuse on June 21, 1982, over a month after he had failed his *first* urinalysis on May 17, 1982. In addition, Mr. Rogers failed two more urinalysis tests, on June 8 and 14, 1982, before he was admitted to the ADAPCP. The only evidence in the record that the Army may have acted sooner is the fact that, in 1979, Mr. Rogers was referred to the Command Drug and Alcohol Program after only one instance of *alcohol* abuse.

abused its discretion when it ruled on such flimsy and insubstantial evidence that Mr. Rogers' involuntary honorable discharge was proper. In fact, the Board, on this record, obviously failed to consider all of the operative "changed" circumstances implicit in the disqualification of the three urinalyses, as well as the fact that only one valid positive urinalysis existed, because in the interest of fundamental fairness, it should have, at the very least, directed the Army to reassess its fundamental position on the merits. Instead, the Board, ignoring the foregoing, coupled with its admitted conclusions, *i.e.*, *that any and all reference to the unsupportable urinalysis would be prejudicial and improper,* blandly proceeded in "grant[ing plaintiff only a] half-a-loaf of relief" by stating that—

> The applicant was properly referred to the ADAPCP for treatment and rehabilitation. He was declared a rehabilitation failure on the basis *OF SEVERAL POSITIVE URINALYSES*, at least one of which has been found supportable.
>
> \*    \*    \*    \*    \*    \*
>
> There is no reason to reverse ... those actions.

(emphasis added).

On this record, we find no rational justification for such a hospitable conclusion given the "reason [not] to reverse," expressed *supra*, nor can we justify why the Board recommended to the Department of the Army that it delete *any and all references to the three positive urinalyses*, on the one hand, while, on the other, it referred to those same *"several positive urinalyses"* when supporting its conclusion—"that ... the discharge ... [was] proper ... [and

t]here is no reason to reverse ... [that] action." Such acts by the Board are clearly contrary to law, especially since the urinalyses were determined to be *"legally ...* unsupportable and could not rightfully serve as the basis for adverse administrative or disciplinary actions." In addition, *Sanders* teaches that such "an action contrary to all evidence ... [is] arbitrary and capricious ... [where it is] seriously prejudicial to plaintiff ... [and is an] abuse of discretion [which] rises to the level of legal error which merits judicial relief." *Sanders*, 594 F.2d at 813. Moreover, the very fact that the Army determined that it was necessary to rely on the three unsupportable urinalyses to justify its conclusions, as well as the fact that the Board admittedly relied on *"at least one"* of those four, emphatically implies that it is *most probable* that the Board not only relied on the *valid* October 1, 1982 urinalysis, but it is also highly probable that it relied on one or more of the unsupportable urinalyses, thereby illustrating to the court that Mr. Rogers would *not* have been involuntarily discharged without such reliance. Accordingly, and based on the foregoing facts, it is cogently clear to the court that the Board's actions in this regard were arbitrary, capricious,[23] with an abuse of discretion,[24] without substantial evidence,[25] and contrary to law.

Over and above the consensus that reliance on *Sanders, supra,* is appropriate as the standard of review by which this court must examine the ABCMR's decision denying Mr. Rogers' reinstatement to active duty, the defendant also relied upon various other cases such as *Snakenberg* and

---

23. Agency action is arbitrary and capricious to the extent the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to the difference in view of the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983); *S & G Excavating v. United States,* 15 Cl.Ct. 157, 161–162 (1988).

24. An abuse of discretion occurs only if findings and conclusions are (i) clearly unreasonable,

arbitrary, or fanciful, (ii) based on an erroneous conclusion of law, (iii) clearly erroneous, or (iv) without any rational basis in the record evidence. *Heat & Control, Inc. v. Hester Indus., Inc.,* 785 F.2d 1017, 1022 (Fed.Cir.1986).

25. The standard for determining whether the administrative decision is supported by substantial evidence is "... whether the administrative determination is supported by substantial evidence *on the record as a whole."* *Brewer v. United States,* 227 Ct.Cl. at 279 (emphasis added).

*Grieg* to support its contention that the ABCMR's decision was neither arbitrary and capricious, in bad faith, unsupported by substantial evidence, nor contrary to law. *See Snakenberg*, 15 Cl.Ct. 809, *Grieg*, 226 Ct.Cl. 258, 640 F.2d 1261. Although we agree with the operative law espoused in these cases with regard to the standard that this court must utilize when examining the ABCMR's decision, we find it sufficient to say that the factual scenarios in these two cases are quite distinguishable [26] from the facts in the case at bar. Consequently, as a result of analyzing the facts in *Snakenberg*, *Grieg*, and *Rogers*, it is quite obvious to the court, and we are satisfied given the facts set forth herein, that Mr. Rogers should not have been determined to be a drug abuse rehabilitation failure, on the operative record evidence, especially in light of the fact that there exists only a *single* piece of evidence supportable of drug activity, and that is the positive urinalysis test taken on October 1, 1982. Additionally, we are constrained to conclude that the ABCMR could not have justifiably and properly determined that the Army acted consistent with applicable regulations where, as here, it prematurely initiated discharge proceedings against Mr. Rogers on November 2, 1982, for drug rehabilitation failure when, according to Mr. Rogers' record, as corrected by the ABCMR, the Army would not have had reason to place him in any sort of drug rehabilitation program until sometime on or after October 27, 1982, the date on which the Army received the supportable test results. Against these indisputable facts, we can only conclude that the Board committed legal error when on insubstantial evidence it failed to reinstate Mr. Rog-

ers to active duty with back pay and all entitled benefits.

### Issue # 2—Were Mr. Rogers' Procedural Due Process Rights Violated?

While Mr. Rogers was discharged from the Army with an honorable discharge, *i.e.*, the highest form of discharge, his procedural due process rights were nevertheless violated inasmuch as a dehumanizing "stigma" attached to his discharge from both the coded and narrative reasons for discharge stated on his Form DD 214 (Certificate of Release or Discharge from Active Duty), thereby entitling him to some form of an adversarial hearing prior to his separation from military service. *See Casey*, 8 Cl.Ct at 241. On the other hand, the court also recognizes that a serviceman has no absolute legal right to remain in the service until the end of his enlistment period, *McAulay v. United States*, 158 Ct.Cl. 359, 364, 305 F.2d 836 (1962), and he may, therefore, be *appropriately* and administratively discharged prior thereto. *Rowe v. United States*, 167 Ct.Cl. 468, 472 (1964), *cert. denied*, 380 U.S. 961, 85 S.Ct. 1103, 14 L.Ed.2d 152 (1965). *See Casey*, 8 Cl.Ct. at 239.[27] Against the foregoing background, therefore, the threshold question at bar is—whether Mr. Rogers was properly discharged in accordance with law and regulation in view of the obvious and indisputable stigmatizing caveat given as the reason for separation, *i.e.*, DRUG ABUSE–REHABILITATION FAILURE.

We begin our analysis by again referencing the pointed holding in *Birt*, 180 Ct.Cl. at 913, wherein the Court of Claims in 1967 observed that invalidation by the judiciary

---

**26.** In *Snakenberg*, it was *clear* on the record that the Board did not act arbitrarily, capriciously, without substantial evidence, or contrary to law in determining that the plaintiff should be discharged for "sexual perversion," because the Board based its decision on the overwhelming evidence set forth in the record establishing that plaintiff secretly and intentionally videotaped nonconsenting women as they undressed. *Snakenberg*, 15 Cl.Ct. at 814. Likewise, in *Grieg*, the facts clearly show that the respective board therein acted correctly in determining that the plaintiff was, pursuant to statute, properly discharged from duty after he was twice con-

sidered but not selected for promotion to the permanent grade of major, due to a *valid* unfavorable officer effectiveness report (OER). *Grieg*, 226 Ct.Cl. at 271–273.

**27.** The court also recognizes that it is well-settled that an enlisted member is entitled to pay and allowances only until the end of the current enlistment period, unless the member has been *properly* discharged prior to that time. *Austin v. United States*, 206 Ct.Cl. 719, 723–724, *cert. denied*, 423 U.S. 911, 96 S.Ct. 215, 46 L.Ed.2d 140 (1975).

of an administrative discharge is appropriate only if such actions "exceeded statutory authority ..., ignored procedural rights, *Murray v. United States*, 154 Ct.Cl. 185 (1961), ... or violated minimum concepts of fairness, *Clackum v. United States*, 148 Ct.Cl. 404, 296 F.2d 226 (1960), ... [in short, w]e may test the validity of a discharge only in terms of its legal sufficiency and not in terms of the military wisdom in discharging one of its members." Additionally, relevant to the foregoing, and as previously referenced herein, the Court of Claims stated in *Keef* that:

> As a general rule, if the regulation pursuant to which a serviceman is honorably discharged does *not*, by its own terms, require notice and a hearing,[28] *they are required* only *if the discharge*, albeit honorable, *either casts a stigma on the serviceman or has some derogatory connotation.* (citations omitted).

> \* \* \* \* \* \*

> Our primary concern in these cases is to prevent the Armed Forces from imposing a penalty on a discharged serviceman without affording him some basic constitutional protection the essence of which is notice and a hearing. As we said in *Clackum v. United States*, ... *we will not permit the imposition of a stigma "without respect for even the most elementary notions of due process of law."*

*Keef*, 185 Ct.Cl. at 467–468 (emphasis added).

█ In the case at hand, Mr. Rogers ostensibly received an honorable discharge; however, the court finds that not only does his separation code contain the letters "JPC(JKK)," which indicates drug abuse, but also said separation code is conspicuously circled, and further, the stigmatizing narrative reason for separation is explicitly noted—"DRUG ABUSE–REHABILITATION FAILURE." *See* Form DD 214, Certificate of Release or Discharge

From Active Duty. It is significant to observe that the foregoing facts clearly and cogently show that there is an even stronger likelihood of an egregious stigma or derogatory connotation being attributed to Mr. Rogers than that which existed in *Casey*, 8 Cl.Ct. at 241. This is true because in *Casey*, he received an honorable discharge "but the authority and reason for discharge includes [only] the coded designation 'JPB' which stands for personal abuse of alcohol and other drugs." *Id.* at 241. Accordingly, in light of the holding espoused in *Keef*, plaintiff is most surely entitled to some form of an adversarial hearing given the egregious "stigma" attached to his discharge.

Moreover, the *Casey* court, in accordance with *Keef*, held that where a "discharge included stigmatizing information ... elementary considerations of due process required a hearing prior to the plaintiff's discharge." *Id.; Keef*, 185 Ct.Cl. at 467. Additionally, the court held that "[a] 'stigma' may attach to a servicemember's discharge either from the characterization of a discharge, or from the [narrative or] coded reasons recorded for the discharge, if such reasons present a 'derogatory connotation to the public at large.'" *Id., citing Birt*, 180 Ct.Cl. at 914. In plaintiff's case, this circumstance is clearly evidenced by the fact that he has been unable to obtain suitable employment after being "honorably discharged" from the service. Obviously, employers still refer to a servicemember's discharge papers when making their hiring decisions.

Despite the foregoing case law, however, AR 635–200, ¶ 9–1, regarding separation for alcohol or other drug abuse, requires only notice, and does not require a hearing where a servicemember receives an honorable discharge.[29] The logic behind such a policy appears to be that if only servicemen with discharges characterized as honorable

---

28. *See* AR 635–200 ¶ 9–1.

29. While, on the other hand, the then applicable *DOD* regulations relating to *alcohol* abuse, under certain circumstances, required a hearing. *See* 32 C.F.R. § 41.11(d)(2) and (e)(1)(i) (1976). *Also see* 32 C.F.R. § 41.6, Part 3.B.1.g (1986).

or ones given under honorable conditions are granted discharges without a hearing, no rights of the servicemember have been violated. Notwithstanding the absence of a precise provision in existing regulations providing Mr. Rogers with a predischarge hearing, we are constrained to conclude that based on Court of Claims precedent he is nevertheless so entitled under "minimum concepts of fairness" on the facts at bar. *Birt*, 180 Ct.Cl. at 913, and *Keef*, 185 Ct.Cl. at 467.[30] Additionally, the facts in *Casey* are substantially similar to the case at bar, where Mr. Casey's Form DD 214 discharge certificate listed the character of his service as honorable but the authority and reason for discharge includes the coded designation "JPB," which stands for personal abuse of alcohol and other drugs. Therein, Judge Yock stated that:

> ... this Court agrees with the plaintiff that his discharge included stigmatizing information and that elementary considerations of due process required a hearing prior to the plaintiff's discharge.

*Casey*, 8 Cl.Ct. at 241.

Premised on the foregoing indisputable facts, *i.e.*, his discharge papers were not only coded to reflect that he was discharged because of drug abuse but that they also contained an explicit narrative which clearly stated that he was a drug abuse-rehabilitation failure, we find that Mr. Rogers has a right to at least a minimal adversarial hearing before the Army may properly discharge him based on the egregious stigmatizing facts stated on his certificate. Accordingly, because the Army failed to grant an appropriate hearing of any form, we further find that Mr. Rogers' right to procedural due process was violated, and that this violation was legal error, where, as here, the ABCMR failed to reinstate plaintiff and to correct his records to the extent of granting him a "full-loaf."

30. *Cf. Guerra v. Scruggs*, 747 F.Supp. 1160 (E.D.N.C.1990), *rev'd*, 942 F.2d 270 (4th Cir. 1991), where the district court held that a servicemember has a liberty interest which requires due process protection by way of an adversarial hearing whenever a discharge is characterized "as a general discharge with the reasons given for discharge being 'misconduct-abuse of illegal drugs." 747 F.Supp. at 1167.

## CONCLUSION

Given the foregoing, we are compelled to GRANT plaintiff's motion for summary judgment, and concomitantly, defendant's motion for summary judgment is hereby DENIED. We reach this conclusion because the ABCMR acted arbitrarily, capriciously, with an abuse of discretion, without substantial evidence, and contrary to law when it failed and refused to reinstate Mr. Rogers to active duty with back pay and entitled benefits. Additionally, because Mr. Rogers' discharge certificate indicated, both by code and by narration, that he was discharged for DRUG ABUSE–REHABILITATION FAILURE, we also find that he was entitled to at least some reasonable form of adversarial hearing *prior* to his discharge in the interests of procedural due process. Consequently, the ABCMR again acted arbitrarily, capriciously, with an abuse of discretion, without substantial evidence, and contrary to law in not granting Mr. Rogers the proper relief warranted under the foregoing circumstances.

Therefore, given the legal error(s) committed by the ABCMR, the following is hereby ordered:

1. Mr. Rogers shall be restored to active duty in the Army at the rank of SP5 retroactively to December 16, 1982;

2. Mr. Rogers shall receive all appropriate back pay to which he is entitled as part and parcel of that office from the date of his involuntary and unlawful discharge from active duty on December 16, 1982, up to the date of a legal discharge; and

3. Mr. Rogers shall receive any and all additional benefits as determined by the Secretary of the Army and to which he is entitled, consistent with this opinion, and as required and permitted by law and regulations.

Finally, and pursuant to 28 U.S.C.

§ 2507(a)[31] and RUSCC 34(d) call,[32] the Secretary of the Army *shall* calculate the amount of any and all back pay and other benefits to which SP5 Rogers is entitled consistent with this opinion from the date of his involuntary discharge, *i.e.*, December 16, 1982, to the last day of the month in which said calculations are made. A copy of the detailed computations summarizing said determination (on a monthly and annual basis) shall be filed with the Clerk of this Court, with a copy in hand to plaintiff, within 90 days from the date of this opinion, *i.e.*, on or before March 18, 1992. Excepting the foregoing, all matters in this court are hereby stayed. Time is of the essence; therefore, no motions for enlargements will be entertained, excepting extraordinary circumstances duly documented by affidavit. Absent any substantial objections by the parties within 20 days from the receipt thereof, the Clerk shall forthwith enter judgment accordingly. No costs.

IT IS SO ORDERED.

---

31. 28 U.S.C. § 2507(a) provides as follows:
   The United States Claims Court may call upon any department or agency of the United States or upon any party for any information or papers, not privileged, ... for use as evidence ...

32. RUSCC 34(d) states in pertinent parts as follows:
   Calls. (1) *Issuance.* Pursuant to 28 U.S.C. § 2507(a), the court at any time
   (A) may call upon any department or agency of the United States for any information or papers it deems necessary to be filed with the clerk within a specified time, or

   (B) in any case appropriate for a computation by a department or agency of the United States, the court, upon the motion of a party or on its own motion, may issue a call for the computation. Within 30 days after the clerk has served notice of the filing of the computation, each party shall file with the clerk its acceptance or rejection of the computation. A rejection shall be accompanied by a statement of the reasons therefor.